UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Michelle Kirby, *et al.*,

    Plaintiffs,

v.

AXA Equitable Financial
Services, LLC, *et al.*,

    Defendants.

Case No. 1:13cv837

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 15) and Plaintiffs' Motion for Summary Judgment (Doc. 16). These motions have been fully briefed. (Docs. 21, 22, 23, 24).

### I. BACKGROUND

On February 7, 1991, Charles B. Wilmer purchased a life insurance policy (the "Policy") from Defendant AXA Equitable Life Insurance Company ("AXA"). (Doc. 15-1, Valerie Long Aff. (6/30/15), Ex. A, PAGEID # 158). Wilmer named his wife, Carolyn Wilmer, and his stepchildren, Plaintiffs Michelle Kirby and James Spivey, as the beneficiaries. (Id., PAGE ID # 160).

The Policy was a flexible premium variable life insurance policy which acts as an investment vehicle and provides for a $200,000.00 cash benefit upon the policyholder's death. (Id.)

As part of the policy, Mr. Wilmer executed a "Request for System-Matic Payment Plan" (the "Payment Authorization") which authorized AXA to withdraw $182.75 from the

Wilmers' joint bank account and deposit those funds into an AXA Policy Account. (Long Aff., Ex. B, PAGEID # 190). Funds were deducted from the AXA Policy Account to cover monthly insurance premiums. However, the Policy provided: "The premium payments shown above may not be sufficient to continue the policy and life insurance coverage in force . . ." (Long Aff., Ex. A, PAGE ID # 160). If the funds being withdrawn through the Payment Authorization were insufficient to cover premium payments, the Policy provides that AXA will:

> send written notice to you and any assignee on our records at last known addresses stating that a grace period of 61 days has begun, starting with the beginning of that policy month. The notice will also state the amount of the premium payment sufficient to cover monthly deductions for 3 months.

(Id., PAGEID # 169). The Policy also provides: "If we do not receive such amount at our Administrative Office before the end of the grace period, we will then . . . send a written notice to you and any assignee on our records at last known addresses stating that the policy has ended without value." (Id.)

During the life of the policy, AXA sent Mr. Wilmer three Notices of Policy Lapse, which informed him that the net cash surrender value of the Policy was not sufficient to cover the monthly deductions. (Long Aff., ¶¶ 12, 15, 16). Each time, Mr. Wilmer paid the amount necessary to cover the shortfall. (Id.) Twice, in December of 2006 and November of 2010, Mr. Wilmer requested that the Payment Authorization amount be increased, first to $220.00, and then to $300.00 per month in order to adequately fund the AXA Policy Account. (Id., ¶¶ 13, 17).

There appears to be no dispute that from 1991 through January 2013, Mr. Wilmer made all required monthly premium payments on the life insurance policy.

In February 2013, the total monthly insurance premium, plus administrative fees,

which AXA claimed was due was $342.15. (Doc. 18, Valerie Long Dep. at 27, 34). This amount, which was scheduled to be withdrawn on January 27, 2013, exceeded the $335.66 available in the Policy Account by $6.49. (Id. at 28-29). AXA claims that on January 28, 2013, it sent Mr. Wilmer a Notice of Policy Lapse advising him that the net cash surrender value was not sufficient to cover the monthly deduction. (Long Aff. ¶ 18).

In January 2013, Mr. Wilmer, who was battling cancer, entered a hospice facility. (Doc. 17-1, Michelle Kirby Dep. at 33). Mrs. Wilmer collected the mail in an accordion folder and brought it to Mr. Wilmer at the hospice facility. (Id. at 33, 49). According to Kirby, Mr. and Mrs. Wilmer were both very methodical about their mail. (Id. at 49). In February of 2013, Kirby visited Mr. Wilmer at the hospice facility and went through the mail in the accordion folder to make sure that nothing needed attention. (Id. at 50-51).

On April 11, 2013, Mr. Wilmer passed away. AXA claims that it sent a Notice of Policy Termination on April 1, 2013. (Long Aff., ¶ 19).

On April 15, 2013, Kirby contacted AXA to collect the death benefit payable on the Policy, but she was informed that the Policy had terminated as of April 1, 2013 due to nonpayment of premiums. (Kirby Dep. at 49). Kirby searched both the accordion file and the Wilmer home for a Notice of Policy Lapse or a Notice of Policy Termination. (Id.) Kirby did not locate the notices. (Id.)

AXA has not paid benefits to Plaintiffs under the Policy. AXA takes the position that because the Policy was terminated as of April 1, 2013, no amounts are due to Plaintiffs. Plaintiffs have brought claims for (1) breach of contract; (2) detrimental reliance and estoppel; and (3) misrepresentation.

3

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

"The standard of review is the same when reviewing cross-motions for summary judgment, but the court must be careful to 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Langston v. Charter Twp. of Redford*, No. 14-1664, 2015 WL 4645851, at *4 (6th Cir. Aug. 6, 2015) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

### B. Applicable law

"It is well-settled in Ohio that in cases involving a contract, the law of the state where the contract is made governs interpretation of the contract." *Nationwide Mut. Ins. Co. v. Ferrin*, 21 Ohio St. 3d 43, 44, 487 N.E.2d 568, 569 (Ohio 1986) (citing *Garlick v. McFarland*, 159 Ohio St. 539, 545, 113 N.E.2d 92 (Ohio 1953)). While some of the briefing relies upon Ohio contract law, there appears to be no dispute between the parties that the contact was made in Illinois and Illinois law applies to the interpretation of the

4

Policy.

## C. Evidence of Mailing of Notice of Policy Lapse

Under Illinois law, the insurance carrier bears the burden of proving that a notice of policy lapse was addressed and mailed to the policyholder. *Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572, 579 (7th Cir. 2001) (citing *Cullen v. North American Co.*, 176 Ill.App.3d 643, 126 Ill.Dec. 95, 531 N.E.2d 390 (1988)).

In support of its contention that notice was mailed to Mr. Wilmer, AXA has submitted the Affidavit of Valerie Long. Long states that the physical mailing of the notices to Mr. Wilmer was performed by a third-party vendor, Broadridge Financial Solutions, Inc. (Long Aff., ¶ 21).

Plaintiffs argue that Long's affidavit should be stricken because the affidavit conflicts with Long's previous deposition testimony. Long testified as follows:

> Q: Is there a department that handles those logistics of issuing those notices?
>
> A: It is a vendor that handles the notices.
>
> Q: Who is that vendor?
>
> A: I don't recall the name at this moment.

(Long Dep. at 18).

To the extent that Long was not able to recall the name of the third-party vendor during her deposition, the Court finds that her affidavit merely "fills a gap left open" in her deposition, and this is not a basis to strike her affidavit. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006).

Plaintiffs also argue that to the extent Long states in her affidavit that Broadridge mailed the Notices to the Wilmers, the facts contained in Long's affidavit are founded

5

upon inadmissible hearsay evidence. Plaintiffs explain that in her deposition, Long testified that she had no knowledge regarding the physical mailing of the notices, so that the only way that Long could have gotten that information is if someone at Broadridge told her that information.

The Court notes that while Long did not have detailed information regarding the process by which AXA sent notices, she did testify generally about the process:

> Q: Does that vendor transmit to AXA somehow copies of these notices that the vendor sent out?
>
> A: My understanding is we transmit to the vendor the notices to be generated but we also keep on [sic] a database here the notices that are generated and sent out.
>
> Q: So if I understand your testimony, the copy you have in your records is a copy of what was transmitted to your vendor?
>
> A: Yes. The format is just different.
>
> Q: Your format is different than what the vendor would send out you mean?
>
> A: Right.
>
> Q: You don't have an actual copy of what the vendor sent out?
>
> A: No, not the actual copy on the nice paper with the AXA logo. No, I do not.
>
> Q: Does the vendor provide AXA with any kind of proof or evidence that the notice was actually mailed?
>
> A: They provide us with numbers and different files as far as what we sent and what they mailed.
>
> Q: I'm not quite following there. What do you mean they provide you with numbers?
>
> A: So when we generate a file to them, we know how many we sent, and then they provide back to us the number that is mailed, which should coincide.

6

> Q: Personally you're not familiar with any of the actual logistics or procedures on how that vendor sends out their notices?
>
> A: Not all the details, no.

(Long Dep. at 18-19).

"[W]hen deciding the admissibility of a post-deposition affidavit at the summary-judgment stage, the district court must first determine whether the affidavit 'directly contradicts' prior sworn testimony." *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009) (citing *Aerel*, 448 F.3d at 908). The Court concludes that Long's Affidavit describing the process by which AXA sent notices does not conflict with her prior deposition testimony. While Long's Affidavit provides more detail, the description of the process is the same. Therefore, the Court will not strike this part of Long's affidavit.

Plaintiffs also challenge the declarations of three of AXA's witnesses: Sabine Detzel, Colleen O'Brien and Roger Weber. (Docs. 22-2, 22-3, 22-4). These witnesses are either employees of AXA or Broadridge. Their declarations explain in detail the process by which notices are generated and maintained by AXA or Broadridge. Plaintiffs explain that AXA has never disclosed any of these witnesses in accordance with Federal Rule of Civil Rule 26 and Plaintiffs have had no opportunity to depose them. Plaintiffs also argue that the documents attached to Detzels' declaration were never produced in discovery. Plaintiffs argue that as a result, their declaration testimony and the attached documents should be stricken in accordance with Federal Rule of Civil Procedure 37(c)(1) and not considered by this Court. Plaintiffs argue that in the alternative, the Court should permit additional discovery.

Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The rule "requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98–5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999)). The potentially sanctioned party has the burden of proving harmlessness. *Id.* "The advisory committee's note to Rule 37(c) 'strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98–5488, 1999 WL 455435, at *5 (6th Cir. June 25, 1999)).

Plaintiffs challenged the Detzel, O'Brien and Weber Declarations and the documents attached to Detzels' declaration in their Reply Memorandum in Support of their Motion for Summary Judgment. (Doc. 24). Because the filing of Plaintiffs' Reply completed the briefing of the parties' summary judgment motions, the Court is left without a response to Plaintiffs' challenge. Accordingly, the Court has no alternative but to strike the Detzel, O'Brien and Weber Declarations and the documents attached to Detzels' declaration. The Court will not consider these documents in its ruling on the parties' motions.

8

### D. Breach of contract

To support their claim of breach of contract, Plaintiffs rely on the following breaches: (1) AXA's failure to abide by its promise to pay a death benefit in exchange for the payment of premiums; (2) AXA's failure to provide written notice to the insured of the Policy lapse and cancellation; and (3) AXA's failure to follow the Payment Authorization.

#### 1. Notice

AXA argues that it has shown that it did provide written notice to Mr. Wilmer. AXA relies heavily on the Seventh Circuit's decision in *Hotaling v. Chubb Sovereign Life Ins. Co.*, 241 F.3d 572 (7th Cir. 2001). The claims in the *Hotaling* case, like this case, centered around whether the life insurance company sent the premium-due notice to the insured. In *Hotaling*, such notice was required by section 234 of the Illinois Insurance Code, which specifically provides that notice is proper if it is properly "addressed and mailed." *Id.* at 574 (citing 215 Ill. Comp. Stat. 5/234(1)).[1]

In *Hotaling*, as in this case, the insurance company, Chubb, was unable to produce a copy of the notice sent to the insured or present an employee who specifically recalled sending the notice. *Id.* at 574-75. However, there was evidence regarding the process by which the insurance company sent notices through a third-party company, Management Applied Programming ("MAP"), which generated a list of the premium notices sent each day. *Id.* at 576. There was also testimony and documentation that the individuals both before and after the insured on the list received their notices. *Id.* The trial court explained:

---

[1] The statutory provision at issue in *Hotaling* does not apply to policies, such as the one in this case, that require premiums to be paid in monthly intervals. *See* 215 Ill. Comp. Stat. 5/234(2).

9

> The question therefore is whether the record contains sufficient evidence to show by a preponderance of the evidence that Chubb actually mailed the premium notice to Morris.  Both Chubb and MAP employ electronic means in order to send out premium notices. In this day and age this is not unexpected .... Direct evidence of mailing or testimony of the mail clerk is not necessary, given the routine nature of [the] mailing of such notices provided there is some corroboration. *Kolias v. State Farm Mutual Automobile Ins. Co.*, 148 Ill.App.3d 1086, 102 Ill.Dec. 609, 612, 500 N.E.2d 502 (1986).  The issue is therefore whether there is sufficient corroborating evidence to sustain Chubb's burden of proof on the issue.  The corroborating evidence that Chubb submitted consisted of evidence that the policy holder directly before Morris and the policy holder directly after her on the extract generated by Chubb and sent to MAP apparently received their notices of premium due because the premium payments were received by Chubb on May 9, 1997, and May 5, 1997, respectively.  This evidence coupled with the evidence that the computer program was designed to print all or none of the premium notices gives the court a basis to believe that it is more probably true than not true that the premium notices were printed and placed in the U.S. mail by MAP as testified to by Wayne Hayes of MAP.  Thus, assuming that neither Morris nor Hotaling received the premium notice, it is more probably true that it was ... misdirected or lost by the post office.

*Id.* at 577-78.  The trial court concluded that Chubb had complied with the statute and that the policy lapsed for non-payment of the premium.  *Id.* at 578.  On appeal, the Seventh Circuit held that:

> it makes good business sense to allow companies to prove that they complied with mailing requirements in ways other than with an affidavit from a specific employee.  Rather, in today's technologically advanced world such mailings: (1) are routinely performed by computers; and (2) frequently contain a large volume of notices mailed at a single time.  If we were to require testimony from a company's mailing clerk, insurance companies would basically be forced to abandon the use of computers in mass mailings.  This would inevitably increase costs which, as we all know, would be passed on to the consumer in the form of higher premiums.

*Id.* at 580-81.

While the process used by AXA is similar to that used by Chubb in *Hotaling*, there is one important difference between *Hotaling* and this case.  *Hotaling* was before the

Seventh Circuit following a bench trial at the trial court level.[2] Moreover, because of the procedural posture of the case, the Seventh Circuit did not determine whether the trial court's decision was supported by the weight of the evidence. *Id.* at 581.

While the Seventh Circuit has made it clear that AXA can prove that a notice was mailed in ways other than with an affidavit from a specific employee, the trial court's finding was not based on proof of the mailing procedures alone. Instead, the trial court relied on corroborating evidence of mailing. *See id.* at 577 (citing *Kolias v. State Farm Mutual Automobile Ins. Co.*, 148 Ill.App.3d 1086, 102 Ill.Dec. 609, 612, 500 N.E.2d 502 (1986) ("Direct evidence of mailing or testimony of the mail clerk is not necessary, given the routine nature of [the] mailing of such notices *provided there is some corroboration*.") (emphasis added). In *Hotaling*, that corroborating evidence was documentation that the individuals both before and after the insured on the list received their notices. AXA has not presented similar information in this case.

The Court finds that based on the evidence in the record at this stage of the proceedings, AXA is not entitled to summary judgment on the issue of whether AXA complied with the Policy by sending written notice to Mr. Wilmer. In her both her deposition and affidavit, Long has described the process by which AXA mails notices. Long states that AXA maintains a record of the policy numbers for which such notices

---

[2] The Court notes that in *Spinelli v. Monumental Life Ins. Co.*, 476 F. Supp. 2d 898, 909 (N.D. Ill. 2007) the district court found that the insurance company's correspondence log was sufficient to show that notices were sent to the insured. The court cited *Hotaling* and explained that "[a]n insurer may prove that notice was addressed and mailed either by an affidavit from a member of the company responsible for mailing such notices or by presenting records that confirm the particular notice was sent consistent with the company's customary practices." *Id.* at 909. The Court also notes that *Spinelli* was before the court upon a bench trial on the papers. *Id.* at 901. Moreover, the wife of the insured testified that only the insured handled correspondence and communication with the insurance company and she did not open any correspondence from the insurance company addressed to her husband. *Id.* at 909.

were mailed which matches the number of mailings confirmed by Broadridge every month. (Long Aff., ¶ 24). However, Long has not provided evidence which would show that these numbers matched on the days the notices were to be sent to Mr. Wilmer. In addition, there is no corroborating evidence, as there was in *Hotaling*, that the policy holders who were sent notices on the same days at Mr. Wilmer received those notices.

In support of it position that AXA did not mail the notices, Plaintiffs rely on the testimony of Kirby, who states in February of 2013, she went through the mail in the accordion folder where the Wilmers kept their mail, but she did not see the Notice of Policy Lapse. Kirby also states that after Mr. Wilmer's death, she searched the accordion file and the Wilmer home for a Notice of Policy Lapse or a Notice of Policy Termination but she did not locate the notices. The Court finds that at this stage of the proceedings this evidence is insufficient to establish that AXA failed to mail the notices.

Therefore, neither party is entitled to summary judgment on this issue.

### 2. Payment Authorization

Plaintiffs argue that AXA breached the Policy by failing to fund the monthly insurance premium pursuant to the Payment Authorization language: "If charges are overlooked or inadvertently not made, AXA Equitable/MLOA may charge my (our) bank account at a later date provided the policy(ies) is (are) still in force." (Doc. 15-1, Long Aff. (6/30/15), Ex. D, PAGEID # 196). Plaintiffs argue that even though AXA knew that the monthly $300.00 credit would be arriving in the Policy Account just one week later, it terminated the policy.

AXA argues that the only reasonable interpretation of this language is that it provides a means for AXA to charge the Wilmer account in the specified amount on a later

date if there was an administrative oversight and the monthly premiums were not withdrawn on the usual due date. AXA explains that this language would allow the authorized amount to be charged if there was a system issue, or the premium due date falls on a holiday or a weekend.

The Court finds that the Payment Authorization language is not applicable to the circumstances here. The language reads: "If *charges* are overlooked or inadvertently not made . . ." In this instance, AXA did not "overlook" or "inadvertently" fail to charge Mr. Wilmer for the monthly insurance premium. Instead, on January 27, 2013, AXA made the charge authorized by the Payment Authorization, which exceeded the amount available in the Policy Account. The Payment Authorization says nothing about making a charge at a later date when there are insufficient funds in the Policy Account to cover the amount of the insurance premium when it is due.

Therefore, the Court finds that AXA did not breach the Policy by failing to fund the monthly insurance premium pursuant to the Payment Authorization language. Plaintiffs are denied summary judgment on this basis.

### 3. Charges

Plaintiffs explain that each month since 2000, AXA has deducted an unlabeled charge in an amount between $.91 and $1.50. Plaintiffs argue that this charge is not permitted by the Policy. Plaintiffs argue that absent these unauthorized charges, the Policy Account would have had sufficient funds and would not have lapsed.

AXA has explained that this charge is a deduction for the 0.5% premium tax under Illinois law. (Long Dep. at 23-24). The Policy provides for a charge for "applicable taxes." (Doc. 15-1, Valerie Long Aff. (6/30/15), Ex. A, PAGEID # 65). The Policy

provides:

> 2.000% of each premium payment. This amount is subtracted from each premium payment. We reserve the right to change this percentage to conform to changes in the law or if the insured person changes residence.

(Id.) While Plaintiffs question the calculation of the charge and the label attached to it, Plaintiffs have not presented sufficient evidence to show that the unlabeled charge was not permitted by the Policy. Therefore, Plaintiffs are denied summary judgment on this basis.

### 4. Death benefit

Plaintiffs argue that AXA breached the contract by failing to pay the death benefit under the Policy. AXA maintains that it properly denied Plaintiffs' claim for the death benefit because the Policy was not in force at the time of Mr. Wilmer's death. Because there is a genuine issue of material fact as to whether AXA sent notice to Mr. Wilmer, neither party is entitled to summary judgment.

### E. Promissory Estoppel

Plaintiffs argue that the Wilmers and Plaintiffs relied, to their detriment, upon AXA's promise to pay the death benefit. However, as one court has explained:

> Under Illinois law, when the parties have entered into an express contract, the contracting parties cannot pursue quasi-contractual claims. *Prodromos v. Poulos*, 202 Ill.App.3d 1024, 148 Ill.Dec. 345, 560 N.E.2d 942, 948 (1990). "[I]f a party's performance under a written contract is the same performance which satisfies the requirement of detrimental reliance, then that party is barred from seeking redress under the doctrine of promissory estoppel." *Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 207 Ill.Dec. 690, 648 N.E.2d 146, 150 (1995) (citing *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 235 Ill.App.3d 224, 176 Ill.Dec. 258, 601 N.E.2d 956 (1992)).

*First Tennessee Bank, Nat. Ass'n v. Lawyers Title Ins., Corp.*, 282 F.R.D. 423, 428 (N.D. Ill. 2012).

14

Here, the Policy is an express contract. Plaintiffs' breach of contract claim is based upon AXA's promise to pay the death benefit under the Policy. Plaintiff's promissory estoppel claim is based upon the same promise. Therefore, Plaintiffs cannot pursue their claim for promissory estoppel. Accordingly, AXA is entitled to summary judgment on this claim.

### F. Misrepresentation

Plaintiffs argue that AXA represented that it would pay a death benefit in exchange for premium payments; that it would send out notices if the Policy lapsed; and that it would see that the Policy remained in force by virtue of the Payment Agreement.

To state a claim for negligent misrepresentation under Illinois law, a plaintiff must allege: "(1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 334-35, 843 N.E.2d 327, 332 (2006) (citing *Board of Education of the City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989)). However, "[a]ccording to Illinois law, insurance carriers are not in the business of supplying information so have no duty to do so." *Asad v. Hartford Life Ins. Co.*, 116 F. Supp. 2d 960, 964-65 (N.D. Ill. 2000) (citing *University of Chicago v. United Parcel Service*, 231 Ill.App.3d 602, 173 Ill.Dec. 64, 596 N.E.2d 688, 691 (1992)).

Because Plaintiffs have not established that AXA had a duty to supply accurate information, the Court concludes that AXA is entitled to summary judgment on this claim.

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1. Defendants' Motion for Summary Judgment (Doc. 15) is **DENIED in PART** and **GRANTED in PART;**

    a. Defendants' Motion is GRANTED as to Plaintiffs' claims for promissory estoppel and negligent misrepresentation;

    b. Defendants' Motion is DENIED in all other respects;

2. Plaintiffs' Motion for Summary Judgment (Doc. 16) is **DENIED**.

**IT IS SO ORDERED.**

 */s/ Michael R. Barrett*
 Michael R. Barrett
 United States District Judge